475 A.2d 481

Ira ROSS

v.

STATE of Maryland.

No. 494, Sept. Term, 1983.

Court of Special Appeals of Maryland.

June 6, 1984.

252

Gary W. Christopher, Asst. Public Defender, with whom was Alan H. Murrell, Public Defender, on the brief, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Thomas E. Hickman, State's Atty., Carroll County, and Frank D. Coleman, Asst. State's Atty., Carroll County, on the brief, for appellee.

Submitted before GARRITY, ADKINS and BLOOM, JJ.

BLOOM, Judge.

On the basis of stipulated testimony, the Circuit Court for Carroll County convicted appellant, Ira Ross, of unlawfully intercepting oral communications and of unnatural and perverted sexual practice. Ross was sentenced to a term of five years imprisonment for interception of oral communications and a consecutive term of ten years for perverted sexual practice.

Ross poses the following questions on appeal:

1. Whether the trial court committed error in denying appellant's motion to suppress a pornographic videotape seized pursuant to a search and seizure warrant.

2. Whether the evidence was sufficient to convict the appellant of having willfully intercepted and recorded the private oral communication of another without consent.

3. Whether the sentence was illegal.

### Factual Background

After his motion to suppress evidence seized from his house was denied, the appellant agreed to proceed on a stipulation of testimony, in return for which the State entered a nolle pros as to several counts in one criminal information and two other informations were placed on the

stet docket. The State placed into evidence a videotape recording that showed the 49-year-old appellant engaged in fellatio with a 15-year-old boy who had been employed at appellant's winery in Carroll County during the fall of 1978. The prosecutor informed the court that the young victim would have testified as to the following events which transpired over a twenty minute period:

That the Defendant asked him to take a break and go with the Defendant to his bedroom. That once in the bedroom, the Defendant told him to sit on the edge of the Defendant's bed. That the Defendant after talking with him for a short period of time, asked to see his thing—referring to the witness's penis. Whereupon, the Defendant pulled the witness's pants down. That the Defendant then placed the witness's penis in his mouth for a period of several minutes. That the Defendant then pulled down his pants and placed his penis in the witness's mouth for a long time. That during this act, the Defendant ejaculated in the witness's mouth.

That one of the reasons that the witness allowed this to happen was because he felt intimidated by the Defendant as an adult and by the fact that the Defendant often wore a gun around the winery.

Although the videotape depicted the appellant wearing a pistol attached to his belt, the trial judge noted that he did not believe the gun "really played that much of a role in the commission of the crime." He stated, however, "There's no question in my mind that the young boy was under total domination of the defendant."

### I. *Suppression of Evidence*

Pursuant to information received from a 13-year-old boy [1] that the appellant had performed fellatio upon him after the boy was hired to work in the winery in 1980, the Maryland State Police obtained and executed a warrant authorizing

---

**1.** Not the same youth alleged to be the victim in the case *sub judice.*

the search for and seizure of certain items believed to be located at appellant's residence.

The application for the search warrant asserted that there was reason to believe that there was concealed at appellant's winery certain "obscene, erotic and pornographic material which is in violation of the laws of Maryland and is evidence relating to the commission of a crime pertaining to aiding the commission of Article 27, Section 464A, second degree sexual offense and Article 27, Section 418, the possession with intent to exhibit obscene material." The accompanying affidavit to support the application asserted that the 13-year-old complainant related that his employer, Ira Ross, had invited him to Ross's bedroom and "showed him an obscene, pornographic and erotic magazine or publication, which had sexual language and photographs which showed men and women participating in sexual acts." The photographs were shown to the victim to arouse him so that Ross could perform fellatio on him. The affiant, a state police officer with experience in investigating sex offenses, believed that the obscene material was used in furtherance of the second degree sex offense reported by the victim and was exhibited in violation of article 27, § 418. The warrant, in turn, described the property to be searched for and seized in the above quoted language of the application.

Armed with the search warrant and a warrant for Ross's arrest, State Troopers Michael Haas and Rudolph Hansen and Assistant State's Attorney Benjamin Love arrived at Ross's home about 8:00 a.m. While Hansen held Ross in custody in the kitchen, Haas and Love began their search of the premises. In Ross's bedroom they found a videotape recorder, videotape camera, and television set. They also found nine videotape cassettes in a dresser drawer. According to Haas, although Ross was specifically advised he need not comply with that request, he readily agreed to demonstrate the operation of the recording device. Ross went into the bedroom and activated the "play" mechanism on the recorder. The motion picture "Patton" appeared on the television screen. Trooper Haas held up three of the

videotapes he had found in the dresser drawer and requested that one of them be played. Ross, without objection, selected a tape bearing the handwritten notation or title "M and I" and inserted it into the recording device with a warning to the officers not to be shocked by what they saw. There then appeared on the television screen scenes of Ross and a woman engaged in various sexual activities. Ross told the officers that all of the tapes from the dresser drawer depicted him in sexual activities with various women.

Ross was then handcuffed and removed from the bedroom. Thereafter, Trooper Haas examined the eight remaining videotape cassettes and noted one that was labeled or titled "Jon and I Bob and I," whereupon he inserted that cassette into the recording device and played it. That tape (the one introduced into evidence in the case *sub judice*) depicted Ross engaged in fellatio with a heavyset young male and later showed Ross engaged in fellatio with a boy between thirteen and fifteen years of age.

Underlying appellant's contention that the court erred in denying his motion to suppress is the general rule explicated by the Court of Appeals in *Brooks v. State,* 235 Md. 23, 29, 200 A.2d 177 (1964), that "property other than that for which a search is being made under the authority of a search warrant cannot be seized under the authority of that warrant because it does not come within the description of the warrant." *See also, United States v. Place,* —— U.S. ——, ——, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983); *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); *Berger v. New York,* 388 U.S. 41, 58, 87 S.Ct. 1873, 1883, 18 L.Ed.2d 1040 (1967); *Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1965).

Appellant contends that the playing of the tape labeled "Jon and I Bob and I" and its seizure exceeded the authority conferred upon the officers by the search warrant. He asserts that since the officers could not tell by looking at

the cassettes whether they were obscene, erotic or pornographic the tapes were not on their face within the scope of the warrant nor were they subject to seizure within the plain view doctrine. Asserting that seizure occurred when the officers removed the tapes from the drawer because that was an " 'act of physically taking and removing tangible personal property,' 1 W. LaFave, *Search and Seizure* 221 (1978); *Hale v. Henkel,* 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906); *United States v. Allen,* 644 F.2d 749 (9th Cir.1980)," appellant argues that this initial seizure did not fall within the ambit of the warrant. The subsequent examination and discovery of the contents of the tape, he contends, was the fruit of the poisoned tree, *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); his acquiescence to the officer's post-seizure request to show the "M and I" tape could not dissipate the taint of the primary illegality.

We reject the major premise behind appellant's contention. The police had a warrant authorizing them to search for and seize certain material. We believe that it would be an unreasonable restraint upon the officers in the performance of their duty to preclude them from removing an object from a dresser drawer in order to subject it to a brief visual examination to determine if it did come within the ambit of the warrant.

Having concluded that the police had a right to pick up the tape cassettes and look at them to determine what they were, we must now determine what was the legal effect of their next step—viewing the tapes on appellant's television screen. That step, we believe, was a separate invasion of appellant's right of privacy in the tapes. The situation was analogous to that in *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980). There, twelve large, securely sealed packages containing 871 boxes of motion picture film depicting homosexual activities were shipped by private carrier to "Leggs, Inc.," in Atlanta, Georgia. They were mistakenly delivered to "L'Eggs Products, Inc.,"

whose employees opened the cartons. When the employees saw that the boxes of film contained suggestive drawings on one side and explicit descriptions of the films on the other, they turned over the cartons to the F.B.I., which, after viewing the films, secured an indictment against Walter. A majority of the Court held that even though the agents were lawfully in possession of the boxes of film they had no authority to search the contents. Viewing the films constituted a separate and distinct invasion of the owner's privacy.

The State argues that viewing the tapes did not invade appellant's privacy because he consented to the use of his videotape recording machine to view the tapes on his television set. That contention is not supported by the evidence. Although appellant voluntarily exhibited the "Patton" tape and either played or consented to the playing of "M and I," he was handcuffed and removed from the bedroom before he had an opportunity to consent or object to the playing of any of the other films. The fact that Ross permitted the police to view one tape showing him engaged in (presumably) non-criminal heterosexual acts can hardly be taken as consent to the playing of the other tape disclosing criminal conduct.

The critical focus of our review is on this question: Did the search warrant authorize the police to invade Ross's privacy to the extent of viewing and then seizing the tape "Jon and I Bob and I" without his permission? We hold that it did not and, for that reason, the court erred in denying appellant's motion to suppress the tape.

■ The warrant did not and could not authorize a general search for and seizure of any "obscene, erotic and pornographic material" in appellant's home. Such broad authorization could not withstand First Amendment scrutiny. Police officers are not permitted to make an initial determination as to what does or does not constitute obscene or pornographic material. As Judge Bishop explicated for this

court in *Macon v. State,* 57 Md.App. 705, 710, 471 A.2d 1090 (1984):

> The complexity of the test for obscenity, and the need to insure that constitutionally protected speech is not discouraged, require that the probable cause determination of obscenity be entrusted not to the police officer, who may lack legal expertise or impartiality, but to the judicial officer, whose knowledge of the law, coupled with his neutrality and detachment, qualify him to make such a decision.

Thus, a search warrant authorizing police to seize "obscene ... publications," with no definition of this term to circumscribe their discretion, was held to be objectionable for lack of sufficient particularity in *Marcus v. Search Warrant,* 367 U.S. 717, 732, 81 S.Ct. 1708, 1716, 6 L.Ed.2d 1127 (1961).

Consequently, the search warrant in the case *sub judice* must be read as limiting the police authority to a search for "obscene, erotic and pornographic material" such as was described to the issuing judge as having been used to further the commission of one crime (art. 27, § 464A—second degree sex offense) in such manner as to constitute another crime (art. 27, § 418—possession of obscene matter with intent to exhibit it).

We note here that under no circumstances can this case be likened to those in which police officers, while lawfully engaged in executing a warrant to search for and seize specific items, come upon narcotics, stolen goods immediately recognizable as such, or gambling paraphernalia. Such material, although outside the scope of the warrant, can be seized because it is contraband. *See Brooks v. State,* 235 Md. at 29, 200 A.2d 177. Even undisputably obscene or pornographic material outside the scope of the warrant cannot be so seized from a home, however, because such material is not contraband *per se.* The mere private possession of obscene matter in one's own home is not a crime and cannot constitutionally be made a crime. *Stan-*

*ley v. Georgia,* 394 U.S. 557, 559, 568, 89 S.Ct. 1243, 1244, 1249, 22 L.Ed.2d 542 (1969).

If the police, in good faith, had reasonably concluded that the videotapes labeled "M and I" and "Jon and I Bob and I" had probably been used in the same manner as the magazine and photographs referred to in the application for a search warrant, that is, exhibited as obscene material to arouse a young boy in furtherance of prohibited sexual conduct, they might well have been justified in seizing the tapes as being within the ambit of the warrant. Such was not their belief or intention, however, as Trooper Haas candidly testified. He acknowledged that there was nothing on the outside of the tapes or their containers "which would honestly indicate that there would be a reason to seize them" but later explained his mental process substantially as follows:

1. Everything the 13-year-old boy told us about the room and its contents has been found to be accurate.

2. In the course of our search we have come upon videotape cassettes, one of which depicts sexual activity between Ross and a woman apparently identified by the initial "M."

3. The names "Jon" and "Bob" appear to be masculine names, suggesting that the tape labeled "Jon and I Bob and I" might very well depict sexual activity between males that is regarded as criminal conduct in this state.

Viewing the tape on Ross's television set and then seizing it, therefore, were invasions of Ross's privacy that were not authorized by the search warrant. The question then arises as to whether the seizure was justified under the "plain view" doctrine as enunciated by Justice Potter Stewart in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In order to legitimate a warrantless seizure under that doctrine, three elements are required: (1) a prior valid intrusion; (2) the inadvertent

spotting of something in plain view; and (3) probable cause to believe that the thing spotted is evidence of crime.

 The prior intrusion was clearly valid in this case. It was by virtue of a valid search warrant. There is no reason to believe that Trooper Haas was looking for anything beyond the scope of the warrant at the time he discovered the tapes. Spotting them may thus be said to be inadvertent. But, as the officer himself acknowledged, there was nothing about the tapes or their containers that made him believe he had reason to seize them. The handwritten title, "Jon and I Bob and I," coupled with information received from the 13-year-old complainant and the sexual activities depicted on the tape that Ross had voluntarily exhibited, may very well have created a reasonable suspicion in the officer's mind that that one tape depicted criminal activity, but this is not sufficient. In order to come within the plain view doctrine, the nexus between the thing seen and a crime must be immediately apparent. In that regard, Justice Stewart stated:

> Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the "plain view" doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.

*Id.* at 466, 91 S.Ct. at 2038.

It was not apparent to the police that the cassette labeled "Jon and I Bob and I" was evidence of a crime until *after* they had examined the videotape by playing it on Ross's set, which constituted a warrantless search, *Walter v. United States, supra,* in that it exceeded the scope of the warrant that had been issued. *See* Justice Stewart's concurring opinion in *Stanley v. Georgia, supra,* 394 U.S. at 571, 89 S.Ct. at 1251.

We hold, therefore, that the seizure of appellant's videotapes violated his Fourth Amendment rights and the court erred in denying his motion to suppress.

## II. *Interception of Oral Communication*

■ We need not consider all of appellant's arguments in support of his second contention. Since the videotape labeled "Jon and I Bob and I" should have been excluded from appellant's trial and since without the audio portion of that tape there would be no evidence of unlawful interception of oral communication, we reverse the conviction for that offense and direct that the charge be dismissed. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

## III. *Legality of Sentence*

■ Although our ruling on the suppression issue requires that we reverse appellant's conviction for perverted sexual practice, there was sufficient evidence exclusive of the videotape to support the conviction. Since appellant may thus be retried on that charge, we will address his third issue as one likely to recur in the event of a retrial.

Appellant earnestly contends that the sentence he received was illegal. He submits that "upon the facts of this case it is unjust, fundamentally unfair, and a denial of equal protection to allow a greater sentence under sec. 554 than is permitted upon conviction for the same conduct under sec. 464C(a)(2)."

As previously stated, appellant was convicted of a perverted sexual practice under Md.Ann.Code art. 27, § 554 and was sentenced to serve the maximum period of ten years imprisonment. The statute, in pertinent part, provides:

> Every person who is convicted of taking into his or her mouth the sexual organ of any other person or animal, or who shall be convicted of placing his or her sexual organ in the mouth of any other person or animal, or who shall be convicted of committing any other unnatural or perverted sexual practice with any other person or animal, shall be fined not more than one thousand dollars

($1,000.00), or be imprisoned in jail or in the house of correction or in the penitentiary for a period not exceeding ten years, or shall be both fined and imprisoned within the limits above prescribed in the discretion of the court.

The statute that defines a fourth degree sexual offense, Md.Ann.Code art. 27, § 464C provides:

A person is guilty of a sexual offense in the fourth degree if the person. engages ... in a sexual act with another person who is fourteen or fifteen years of age and the person performing the sexual act is four or more years older than the other person....

Any person violating the provisions of this section is guilty of a misdemeanor and upon conviction is subject to imprisonment for a period of not more than one year, or a fine of not more than $1,000, or both fine and imprisonment.

The definition of a "sexual act" under art. 27, § 461(e) is:

"Sexual act" means cunnilingus, fellatio, analingus, or anal intercourse, but does not include vaginal intercourse....

Appellant argues that it is apparent from the facts that he could have been prosecuted for having committed a fourth degree sexual offense; that he was neither more nor less guilty of perverted practice than he was of a fourth degree sexual offense; that under the rationale of *Waye v. State*, 231 Md. 510, 191 A.2d 428 (1963), the legislature intended to limit the penalty regarding identical conduct to no more than one year; and that as expressed in *Simms v. State*, 288 Md. 712, 723, 421 A.2d 957 (1980), to affirm the sentence of ten years "would be to sanction an extreme anomaly in the criminal law."

*Waye v. State, supra,* presented a problem somewhat analogous to the one in this case. In *Waye*, the defendant passed a bad check for which he could have been prosecuted either under the Worthless Check Act, art. 27, § 142 with a maximum penalty of eighteen months imprisonment or under the False Pretenses Act, art. 27, § 140 with a maximum

sentence of ten years. The State chose to prosecute him under the latter statute and the defendant received a sentence greater than eighteen months. In rejecting that disposition, the Court observed:

> An analysis of this situation shows that it presents problems. . . . Did the Legislature intend to limit the penalty under the above circumstances if the prosecution be brought under § 142, but permit the higher penalty (up to ten years, and contrary to the above-quoted provisions of § 142), if, under identical facts, the prosecution be brought under § 140? These questions must be answered in deciding the case.
>
> Repeals by implication are not favored. The amendment of § 142, in 1955, did not, we think, amend by implication § 140 to the extent that if a worthless check be involved and the property obtained be valued at less than $100, the prosecution is limited to § 142. We, therefore, hold that under such circumstances the prosecution may, as heretofore, be brought under either section. However, we do not believe that the Legislature intended to create such an anomalous and incongruous situation as to limit the penalty, when a worthless check and property valued at less than $100 are involved, to $50 and eighteen months' confinement when the prosecution is under § 142, but to permit a much higher and more severe penalty under identical facts simply because someone decides to bring the prosecution under § 140. We, therefore (without considering possible constitutional aspects that a contrary ruling might produce), hold that the amendment of § 142 in 1955 amended, or modified, § 140 to the extent that when there is a conviction under § 140 for the giving of a worthless check and the property obtained is valued at less than $100, the maximum penalty that may be imposed is a fine of $50 and eighteen months' imprisonment.

*Waye*, 231 Md. at 516, 191 A.2d 428.

Thus, while the Court in *Waye* refused to note a repeal of the statute by mere implication, it readily recognized the

incongruous situation regarding the penalty and found, on the basis of the similar conduct required under both statutes, that the legislature intended to limit the maximum penalty to the lesser sentence when property valued at less than $100.00 was obtained by worthless check.

We recently had occasion to consider whether the legislature intended to preempt the entire field of criminal sexual activity when it repealed a number of pre-existing statutes dealing with rape and related offenses while enacting in their stead the present degrees of sexual offenses. As we noted in *Gray v. State,* 43 Md.App. 238, 240–241, 403 A.2d 853 (1979):

> Additional evidence of the fact that the Legislature did not intend to preempt the entire field of criminal sexual activity was the non-repealer of § 553 (Sodomy) and § 554 (Unnatural or perverted sexual practices).[2]

It would appear, therefore, that the legislature did not intend to prevent the prosecution of a criminal defendant under either § 554 or § 464C. The question remains, however, whether the legislature intended to limit the penalty to a maximum of one year in prison for conduct that violates § 464C. We turn to *Simms v. State, supra,* for guidance.

In *Simms,* which also includes the companion case of *Thomas v. State,* the jury returned a verdict of "not guilty" of assault with intent to rob but "guilty" as to simple assault. In each case, the appellants contended on appeal that because the maximum punishment for assault with intent to rob was ten years the sentence they received of twelve years for the lesser included offense of simple assault was improper. Writing on behalf of the Court, Judge Eldridge observed:

---

**2.** "It cannot be claimed that the Legislature overlooked these sections for the same Chapter 573 of the Acts of 1976 which restructured the rape and rape-related offenses also made several minor stylistic changes to § 553 and § 554." *Gray,* 43 Md.App. at 241 n. 3, 403 A.2d 853 n. 3.

To uphold the twelve year sentences under these circumstances would be to sanction an extreme anomaly in the criminal law. It would permit a defendant to be punished more severely because of an acquittal on a charge. He would have fared better if he were less successful or had pled guilty to the greater charge of assault with intent to rob. *Cf. Johnson v. State*, 274 Md. 536, 543, 336 A.2d 113 (1975), holding that "a price may not be exacted nor a penalty imposed for" pleading not guilty.

. . . . .

Accordingly, we hold that when a defendant is charged with a greater offense and a lesser included offense based on the same conduct, with jeopardy attaching to both charges at trial, and when the defendant is convicted only of the lesser included charge, he may not receive a sentence for that conviction which exceeds the maximum sentence which could have been imposed had he been convicted of the greater charge.

*Simms*, 288 Md. 723–724, 421 A.2d 957.

More importantly, in relation to our question under consideration in the case at bar, the Court in *Simms* emphasized that its holding was a narrow one and declined to go as far as some other jurisdictions in two respects. First, the Court grounded its decision on the Maryland common law rather than on constitutional proscriptions against cruel and unusual punishment. Second, the Court rejected the holding from other jurisdictions that even when a greater offense is not charged (such as in the case *sub judice*) the punishment for the lesser offense can never exceed the maximum prescribed for the greater. The Court explained:

This Court, along with most other courts, has consistently held that the only feasible test for determining what is a "greater" and what is a "lesser included" offense is the so-called "required evidence" test of *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, [182], 76 L.Ed. 306 (1932), which focuses upon the elements of the

crimes. Furthermore, it is only when two offenses, based on the same transaction, are deemed the same under this test that multiple punishment is generally prohibited. *Whack v. State,* 288 Md. 137, 142, 416 A.2d 265 (1980), and cases there cited. While usually the "greater offense" under this test will represent the more heinous or aggravated crime, this is not always true. In some situations when the Legislature creates a greater offense by adding an element to a basic crime such as larceny or false pretenses, the additional element may have been viewed as a mitigating rather than an aggravating factor, and for this reason a lesser maximum penalty is provided for the particular greater offense. This is illustrated by the offenses involved in *Johnson v. State, supra,* 283 Md. at 203–204, [336 A.2d 113] and *Slye v. State,* [42 Md.App. 520, 401 A.2d 195 (1979)]. Also, basic crimes such as simple assault or larceny can embrace an almost infinite variety of fact patterns. Some "simple assaults" may involve more brutal or heinous conduct than may be present in other cases falling within one of the statutory aggravated assaults. Moreover, these two situations could be combined, *e.g.,* where there is an assault with intent to rob accompanied by extremely brutal conduct. Where this occurs, and where the State decides to prosecute just for basic assault because of the brutal nature of the conduct, a sentence exceeding the statutory maximum for assault with intent to rob is not "grossly out of proportion to the severity of the crime." In our view, these considerations are entirely overlooked by the cases in other jurisdictions which hold that the maximum penalty for a lesser included offense can never exceed the maximum for a greater, regardless of the facts or the charges made in a particular case.

In sum, we do not believe that a sentence for simple assault, which exceeds the ten year statutory maximum sentence for assault with intent to rob, necessarily violates the prohibition against cruel and unusual punishment. On the other hand, where the State charges both

assault with intent to rob and simple assault, each charge being based on the same acts, and the defendant is put in jeopardy, the State has in effect elected to prosecute for the ten year maximum penalty specified for the greater offense of assault with intent to rob. Consequently, the twelve year sentences imposed upon Simms and Thomas are invalid. The cases should be remanded for resentencing in light of present facts and circumstances, but in no event can the sentence in either case exceed ten years' imprisonment.

*Id.* at 726–727, 421 A.2d 957 (footnote omitted).

In the case at bar, the additional element required in a fourth degree sexual offense that the victim be "fourteen or fifteen years of age" determined that crime as the "greater offense" even though the penalty for committing the "lesser included" offense was far greater. As distinguished from *Simms,* however, the State herein elected to charge the appellant only with the basic offense of committing a perverted sexual act. Thus, the statutory penalty limit of one year under a fourth degree sexual offense would not apply.

Section 554 requires neither the use or threat of force nor the absence of consent in order to obtain a conviction for perverted sexual practice; § 464C requires either the absence of consent or the factor of the victim's youth for a conviction of fourth degree sexual offense. Here, the evidence established not only that the victim was only fifteen years of age but also that he was intimidated by the appellant. Because the intimidation was an aggravating factor that exceeded the statutory requirements of § 464C, we believe that the sentencing limitations of *Wayne* do not apply. This is precisely the type of case referred to in *Simms* as the basis for the Court's rejection of the doctrine that punishment for the "lesser" offense can never exceed the maximum penalty prescribed for the "greater."

We hold, therefore, that prosecution of appellant for violation of § 554 instead of § 464C was valid and that

there is no legal impediment to the imposition of the maximum sentence under § 554.

JUDGMENTS REVERSED AND CASE REMANDED FOR RETRIAL ON THE CHARGE OF PERVERTED SEXUAL PRACTICE ONLY.

COSTS TO BE PAID BY CARROLL COUNTY.

GARRITY, Judge, dissenting.

I respectfully dissent from that portion of the majority's opinion declaring the tape to have been illegally seized.

While appreciating the intent of the majority to preserve the right to privacy, I believe that under the totality of the circumstances of this case, the seizure of the tape depicting the 49-year-old appellant committing fellatio upon his 13-year-old victim was not unreasonable. The seizure clearly fell within the warrants authorization to seize "obscene, erotic and pornographic material which is ... evidence relating to the commission of a crime pertaining to aiding the commission of ... second degree sexual offense and ... the possession with intent to exhibit obscene material." Furthermore, even if the seizure of the tape had not fallen within the scope of the warrant, as there was probable cause to believe that the seized tape was evidence of a crime, the tape could have been validly seized without a warrant.

## Search Warrant

While I am sensitive to protected rights and liberties under the First, Fourth, and Fourteenth Amendments to the Federal Constitution, I believe the construction placed on the language of the search warrant by the majority to be far too narrow. The only tape that was introduced into evidence—and consequently, the only one that should have concerned the majority—was labeled "Jon [18] and I, Bobby [14]

and I." [1] That tape depicted the very type of conduct and activity described in the search warrant. Moreover, it was the type of material which could have been prepared and possessed by the appellant with an intent to exhibit in violation of Article 27, Section 418.[2] I believe the trial court properly denied appellant's motion to suppress the pornographic material prepared by the appellant and found in his possession.

In fact, the appellant made no argument either below or on appeal that the tape did not depict the very conduct that was the subject of the search warrant. The theory of defense was that as one could not determine the pornographic nature of the film from the mere labeling of the tape cassettes ("M & I"; "Jon and I, Bobby and I"), the tape was illegally seized by the police at the point of its removal from the dresser drawer. The appellant did not venture to argue that the tapes were illegally seized *after* viewing. That unique argument belongs to the majority.

The majority declared that although "the police had the right to pick up the tape cassettes and look at them to determine what they were ... viewing the tapes on appellant's television screen ... was a separate invasion of appellant's right of privacy in the tapes." I totally reject such theory.

If the police had initial valid authorization to search and seize pornographic material relating to evidence of a second degree sexual assault, they most certainly had the right to meaningfully view the video tape that they in good faith reasonably believed depicted illicit conduct—even in the absence of the appellant's consent. The mere ability to

---

**1.** The numerical references appeared on the labels above the names of Jon and Bobby.

**2.** Article 27, Section 418 provides, in pertinent part, "Any person who knowingly *prepares,* publishes, *prints, exhibits,* distributes, or offers to distribute, *or has in his possession with intent to* distribute or to *exhibit* or offer to distribute, any obscene matter is guilty of a misdemeanor." (Emphasis added).

"pick up the tape cassettes and look at them to determine what they were"—as allowed by the majority—is a very hollow, meaningless privilege.

On the contrary, up to this point at least, Maryland law has always permitted officers executing a valid search warrant to inspect containers which could contain contraband in order to assess the nature of the contents and determine if a seizure is required. *Davis v. State*, 32 Md.App. 318, 326, 360 A.2d 467, *cert. denied*, 278 Md. 720 (1976) (permissible for officer searching for pistol to open a briefcase); *Andresen v. State*, 24 Md.App. 128, 178–180, 331 A.2d 78 (1975), *aff'd sub nom. Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976) (permissible for officer searching for evidence of criminal fraud and false pretenses to open suspect's office file folder and seize selected documents).

The U.S. Supreme Court recently decided a case that is similar both factually and legally to the present matter. In *United States v. Jacobsen*, —— U.S. ——, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Court held that police officers validly on a premises did not need a search warrant before testing a suspected substance to determine whether it was contraband. Addressing the issue of privacy, the Court ruled that chemical testing was a permissible, *de minimis* intrusion which did not compromise the defendant's expectations of privacy.

Although the material in the case *sub judice* was contained on a tape, obscenity is beyond the pale of First Amendment protection. *Marques v. State*, 267 Md. 542, 298 A.2d 408 (1973). As with *Jacobsen*, the only right at issue is that of privacy under the Fourth Amendment through the Fourteenth. As in *Jacobsen*, I believe the intrusion of privacy in order to view the tape was *de minimis.*

### Warrantless Seizure

The trial court found that:

[T]he defendant voluntarily and with full knowledge of his rights consented to the insertion of the video tape labeled "M & I" into the video tape recorder. Upon the activation of that device with the tape so inserted, subject matter of a clearly pornographic nature was displayed. Clearly, this procedure constituted a valid consent search. The seizure of the tape inserted was therefore proper.

An issue remains, however, with respect to the validity of the seizure of the remaining video tapes. After viewing the video tape marked "M & I", Tfc. Haas examined the other video tapes found in the same drawer and noted that at least some of them were similarly labeled, and selected one marked "Jon and I, Bob and I" for insertion in the device. In light of the subject matter previously displayed upon the insertion of a similarly labeled video tape found in the same drawer, the Court finds that this action did not constitute an unreasonable intrusion upon the rights of the Defendant.

. . . . .

Furthermore, at the hearing the Defendant failed to present any evidence tending to establish that any of the items seized contained matter not within the terms of the warrant. Accordingly, the Court will deny the request to suppress this evidence.

I firmly believe that in addition to the obscene material falling within the scope of the warrant, the seizure was authorized under the post-intrusive plain view doctrine as probable cause clearly existed subsequent to the consensual showing of "M & I" to believe that the tape in question with age notations, contained evidence of a crime.

The "plain view" exception to the warrant requirement was first clearly enunciated in *Coolidge v. New Hampshire*, 403 U.S. 443, at 466, 29 L.Ed.2d 564, at 583:

What the "plain view" cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The

doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them.

As observed in Gilbert and Moylan, *Maryland Criminal Law: Practice and Procedure* 391 (1983):

§ 34.5. *Elements of the Plain View Doctrine.*

In a well-crafted opinion for the Court, Justice Stewart set out clearly the elements that are required to legitimate a warrantless seizure under the Plain View Doctrine:

(1) a prior valid intrusion;

(2) the inadvertent spotting of something in plain view; and

(3) probable cause to believe that the thing spotted is evidence of crime.

Obviously, the State police validly intruded into the constitutionally protected area under color of a search warrant. Thus, the first requirement was satisfied.

The second requirement may also be summarily disposed of as satisfied. The police, because of the subject matter being sought, had a right to search the drawer of the appellant's dresser. As pointed out by the Supreme Court in *Harris v. U.S.*, 331 U.S. 145 at 152, 67 S.Ct. 1098 at 1102, 91 L.Ed. 1399, "The same meticulous investigation which would be appropriate in a search for two small cancelled checks could not be considered reasonable where agents are seeking a stolen automobile or an illegal still". When Tfc. Haas inadvertently came across the tapes in opening the dresser drawer, the second requirement was satisfied.

Regarding the third requirement, I believe it is appropriate to recount what we had stated in *Dixon v. State*, 23

Md.App. 19, at 31, 327 A.2d 516 (1974). Speaking on behalf of the Court, Judge Moylan observed:

> It is beyond cavil that a prior valid intrusion will not in and of itself justify an indiscriminate seizure of all items that happen to be visually in plain view, but that probable cause must exist to believe that the items ultimately seized are, indeed, contraband or other evidence of crime.

Also cited with approval in *Dixon, supra,* at 33, 327 A.2d 516, is the following statement from *Shipman v. State,* 291 Ala. 484, 282 So.2d 700, at 704:

> For an item in plain view to be validly seized, the officer must possess some judgment at the time that the object to be seized is contraband and that judgment must be grounded upon probable cause.

Thus, the third requirement is simply that the searching officer, before seizing an item in plain view, have probable cause that it is evidence of a crime. I would have held that the police, through Tfc. Haas, had probable cause to believe that the tapes were evidence of a crime for the following reasons:

Tfc. Haas testified that before searching the dresser drawer, he had searched the adjacent closet. In the closet, he said, was a video camera aimed at the bed. The victim had informed Trooper Haas (as reported in the affidavit portion of the search warrant) that the appellant had pushed him down on the bed in the appellant's bedroom and performed fellatio upon him. When the trooper opened the dresser drawer, he found video tapes. On the boxes containing the tapes were the names of individuals followed by "and I." As previously pointed out, the ages of the individuals were also noted above their names. Two of the names that Tfc. Haas said he could remember were names of males. Trooper Haas, the investigating officer, was well acquainted with the nature of the charges and crimes that allegedly had been committed by the appellant. Certainly, Trooper Haas could have drawn the inference that the tapes contained scenes of the appellant and others in sexual encounters, and in view of the victims' representations that

he had previously interviewed, that the sexual encounters involved illegal acts. In fact, the trooper stated, when asked what he thought upon coming across the tapes, that he believed in light of the materials thus far seen, and because of the victims' statements to him, that the tapes contained evidence of illegal sexual activity.

In summary, I would have affirmed the trial courts' denial of appellant's motion to suppress on the following grounds:

1. That the language of the search warrant authorized the seizure of the tapes as viewed by the executing authorities.

2. That the search of the dresser drawer, and the material on the tapes themselves, was proper in light of the subject matter of the warrant, and the intensiveness required for the items sought.

3. That the viewing of "M and I", which triggered probable cause to believe the tape cassette labeled "Jon (18) and I, Bobby (14) and I", contained evidence of a crime, had been consented to by the appellant.

4. That the search and seizure of the tapes complied with the plain-view exception to the warrant requirement.